Tharp S. Roberts v. Commissioner.
Tharp v. Commissioner
Docket No. 5013.
United States Tax Court
1945 Tax Ct. Memo LEXIS 110; 4 T.C.M. (CCH) 814; T.C.M. (RIA) 45263; July 30, 1945
*110 Clarence G. Ashby, Esq., 1503 Barnett Bldg., Jacksonville 2, Fla., Henry P. Adair, Esq., and H. Maurice Fridlund, Esq., 120 Broadway, New York 5, N. Y., for the petitioner. Edward L. Potter, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: Petitioner contests the portion of a deficiency in gift tax for the calendar year 1940 in the amount of $6,168.70 which results from the inclusion in total gifts of the additional amount of $55,305. The sole issue is the value of 300 shares of the capital stock of Monticello Drug Co. transferred by gift by petitioner to his three children in equal proportions during the taxable year. Findings of Fact Petitioner is a resident of Jacksonville, Florida. His gift tax return for the calendar year 1940 was filed with the collector of internal revenue for the district of Florida and the tax shown to be due was paid. Total gifts for 1940 aggregating $40,825 were shown. The Commissioner determined that total gifts aggregated $96,167.51. Exclusions aggregating $12,000 were claimed and allowed. On January 26, 1940, petitioner made gifts to each of his three children of 100 shares of the capital *111 stock of Monticello Drug Co. In his gift tax return he valued the stock at $100 per share. The Commissioner determined that the stock had a value of $284.35 per share. One other adjustment made by him is not contested. Monticello Drug Co. (hereinafter sometimes referred to as the company) is a Florida corporation, incorporated about 1908. Its office and principal place of business is in Jacksonville. Its business is, and for many years has been, manufacturing and selling patent medicines and purchasing and managing real estate and stocks and bonds for investment purposes. Petitioner has been its president since organization and his son, T. S. Roberts, Jr., has been its secretary since 1929 except for a period of approximately a year and a half while he was in the United States Navy. The capital stock of the company consists of 10,000 shares of the par value of $100. All of them have been outstanding for the past 15 years. There have been few sales of the stock, the transfers being largely from petitioner to his children although some have been purchased by others, chiefly employees of the company. The record does not show the stock ownership at the time of the transfers giving *112 rise to the present controversy. T. S. Roberts, Jr., at the time of the trial owned 2,010 shares, including the 100 given to him by petitioner on January 26, 1940. Of this number 10 shares had been purchased by him on January 3, 1940, at $100 per share and the balance were gifts from petitioner. Apparently approximately the same number of shares had also been given by petitioner to his other two children. The total number of shares transferred on the books of the company since 1929 other than those transferred by gift were 617. This includes a transfer in 1943 of 236 shares from the estate of a deceased former employee (Dr. J. R. McEachern) to the company and the subsequent transfer of the same number of shares to others, including 40 to petitioner and 100 to a nephew and adopted son of the deceased at $100 per share. The balance sheet of the company as of December 31, 1939, shows the total net worth of the company to be $2,379,592.52 with liabilities, exclusive of capital stock, of $95,786.69 and surplus of $1,379,592.52. There is no controversy as to any of the figures shown, except the true surplus. The aggregate of the assets shown by the balance sheet is $2,475,379.21. This *113 includes stocks and bonds carried at $880,366.88 which respondent concedes had an aggregate value on the date of the gifts of but $484,919.93. Using the latter figure the assets of the company, somewhat condensed for simplification, were: Cash
$60,505.52
Accounts Receivable
Customers
62,903.66
Rents
4,388.47
Inventory
51,432.50
Total Current Assets
$ 179,230.16
Land
53,396.91
Buildings
$66,146.00
Reserve for Depreciation
43,968.14
22,177.86
Furniture, Fixtures and Autos
69,732.43
Reserve for Depreciation
46,832.18
22,900.25
Total Fixed Assets
98,475.02
Investment, Notes and Mortgages
205,750.66
Investment, Stocks and Bonds
484,919.93
Investments, rental properties, land, buildings, furniture and
equipment
1,048,640.51
Investments, Ranch, Improvement and Livestock
33,107.17
Other assets
29,808.82
$2,079,932.26
The item "Investments, rental properties, land, buildings, furniture and equipment, $1,048,640.51" is comprised principally of rental property in Jacksonville, Florida, approximately two-thirds of it (in value) being downtown real estate and the remainder (including furniture *114 and fixtures of $7,335.77) being residential property. The book value of the most valuable of the downtown real estate is shown in the first column of the schedule below and the fair market value of each is shown in the second column. Column I
Column II
Property
Date acquired
Book Value
Fair Market Value
Roosevelt Hotel Site
1933
$115,577.00
$125,000.00
Exchange Building
1936
180,288.55
103,500.00
Roberts Building
1923-'29
176,873.91
145,300.00
425 W. Adams
1928
94,466.68
45,500.00
Adams & Clay
1936
56,675.00
58,500.00
509-15 W. Adams
1932
36,769.83
27,250.00
1252 W. Adams
1933
18,717.50
10,500.00
116-18 Julia
1923
26,844.00
10,000.00
$706,212.47
$525,550.00
70 smaller properties, largely residential, purchased on various dates had a book value on the date of the gift of $342,428.04 and a fair market value on the date of the gift of $355,586.83. The fair market value of the property shown in the balance sheet as "Investments, rental property, buildings, furniture and equipment" was $881,136.83. The item "Investment, Notes and Mortgages 205,750.66" is comprised of mortgages in the aggregate amount of $55,645.02 *115 and secured notes in the amount of $150,105.64. The fair market value of the mortgages on the date of the gift was $55,645.02. The largest note among the secured notes was one of Thurston Roberts, secured by 500 shares of Monticello Drug Co. stock and 400 shares of Edgewater Realty Co. stock. This note, in the face amount of $73,600 had a fair market value of that amount. The next largest note was signed by J. R. McEachern, at that time an employee of the company but who is now deceased, in the amount of $68,145.39. This note was secured by 236 shares of Monticello Drug Co. which, after McEachern's death, were purchased by the company for $23,600 and by a mortgage upon real estate. It had a fair market value at the time of the gift of $25,000. The fair market value of all the notes and mortgages on the date of the gift was $162,605.27. Each of the assets shown in the schedule above, other than those referred to in the last three paragraphs, had a fair market value equal to the amount shown in the schedule. The aggregate fair market value of the property owned by the company on January 26, 1940, was $1,869,283.19. The average annual total earnings of the company (including for some *116 of the years a realty company later merged into it) for the 9 years 1931 to 1939, inclusive, was $62,181.79. Losses sustained from sales of real estate, stocks and bonds during the same period averaged $20,753.23 per annum. The average net earnings for the same period was $41,428.56. The total dividends paid was $360,900, an average of $40,100 per year. The average income taxes paid was $4,502.88 per year. The average net earnings after the payment of taxes was $36,925.68. The total of the earnings for 1940 was $89,039.80 and the loss from the sales of real estate, stocks and bonds (mostly South American securities) was $79,775.40. The fair market value of the stock of the Monticello Drug Co. On January 26, 1940, was $165 per share. Opinion The last finding which has been made is dispositive of the sole issue. No attempt to rationalize it completely or to assign to any particular evidence the precise weight which has been given to it needs be made. A brief discussion of the evidence, however, is not amiss. Counsel for both parties, with commendable thoroughness and fairness, have analyzed all of the evidence upon brief and have made certain concessions which have been helpful *117 in finding the answer to the vexing problem. Thus respondent concedes that the stocks and bonds, carried on the balance sheet at $880,366.88, should, for present purposes, be considered to have a fair market value of but $484,919.93, this being the aggregate amount - the mean between the high and low - for which they could have been sold on the basic date. Both parties also concede that the evidence of one of the witnesses, called by petitioner as an expert upon valuation of the several pieces of real estate, was quite persuasive and fair. He showed familiarity with the property and appeared to have taken into consideration the factors usually considered - the location, type of construction, adaptability, depreciation sustained, market trends, etc. The values shown in our findings are the values fixed by him. Petitioner adopts it in his computation of the value of all of the assets, which he computes to be $1,689,231.67 and respondent adopts it in his computation, which shows an aggregate value of $1,912,428.58. Under the circumstances we think it is fair to assume that the value is substantially the value fixed by the witness, although we have not overlooked respondent's suggestion *118 that it is the minimum or petitioner's suggestion that it is the maximum amount which should be considered in determining the value of all the assets. The evidence covered a wide range. Petitioner, testifying as a witness, fixed the value of the investment real estate at $613,000 and his son, Tharp S., Jr., fixed it at $650,000. Each expressed the opinion that the stock had a fair market value of $100 or less. Two gentlemen, called by petitioner as expert witnesses upon the valuation of stock generally, expressed opinions that the stock had a value of less than $100 per share. One was president of a large Jacksonville bank and the other was vice-president and trust officer of another large bank. One stated that he "would not have paid over $86 a share" for the stock in January 1940, basing his testimony upon the balance sheets for the years 1936 to 1939 and the company's record of earnings. He compared the stock with American Can, A.T. & T., Chrysler, Corn Products, Dupont, National Steel, Standard Oil of N. J., Westinghouse and others from the standpoint of earnings, dividends, investments, etc., and determined that funds invested in those companies would have given a return of *119 6-3/10 percent. Valuing the "Drug Co. stock on the basis of 6 1/2 percent rather than on the dividends, which were $5.63 per share paid for the five year period, it would give you a value of $83.00 per share. If you valued it upon the basis of the earnings it would have only given you a value of $62.00 per share." He also stated that if the market value of certain drug stocks examined by him, which paid 12.37 times their earnings per share, be taken for comparative purposes the value would be still lower. The other witness expressed the opinion that the stock had a value of $85 to $90 per share, not exceeding $90. He based that upon a comparison and analysis of the audit reports for an eleven year period 1931 to 1941, inclusive, and supplemental data with reference to sales, dividends and market value of listed securities. Tharp S. Roberts, Jr., testified that in his opinion the fair market value of the accounts receivable and the inventory was not in excess of 50 percent of the amount shown on the balance sheet. Bad debts were being deducted at the rate of approximately $5,000 per year and there is no evidence indicating the accounts receivable, in the experience of the company, *120 had been substantially in excess of that amount. The inventory would probably have brought less in a forced sale than the amount shown; but fair market value presupposes a willing seller, not compelled to sell, as well as a willing buyer. He also expressed the opinion that the plant real estate, the land alone of which is carried at a value of $53,396.91, had a value not in excess of $20,000. The buildings undoubtedly were old, since the depreciation previously claimed was $43,968.14, leaving an undepreciated cost of $22,177.86. He also reduced the value of several of the other smaller assets - equipment, autos, ranch equipment, Mexico branch, Brazil branch, to mention some of them - by from 50 percent to 66 2/3 percent. There was no other evidence supporting a smaller valuation and his testimony was not particularly persuasive. We have, however, substantially accepted his appraisal of notes receivable, allowing a reduction of $45,000 in lieu of the $50,000 estimated by him. The value fixed by us for all of the assets, therefore, seems to be well within the evidence. The value which we have determined for the stock represents our best judgment of what it would bring in a transaction *121 of the type already mentioned, i.e. as a purchase by a willing buyer from a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the property and its value. Petitioner dwells at length upon statements in text books and decided cases to the effect that asset value alone is not determinative of the value of stock and that earning power is a more reliable guide. The principles are well-understood but need not be restated at any length here. Respondent also cites the earnings as supporting a value in excess of asset value. This much is clear. The earnings have been reasonably good and steady. They do not, however, support a conclusion that any substantial amount should be added for good-will. But neither do they justify a finding that any appreciable amount would be lost in the event of liquidation. The company was obviously largely owned by the Roberts family. Most of the property owned is readily susceptible of division in kind, consisting, as it does, of cash, real estate, investments in stocks, bonds, notes and mortgages having a clear value in excess of a million and a half dollars. The discussion need not be extended. All of *122 the circumstances just alluded to and the evidence, arguments and suggestions of counsel have been carefully considered in making the finding that the stock had a fair market value on the basic date of $165 per share. It follows that the deficiency in tax must be recomputed. Decision will be entered under Rule 50.